UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| INGRID FISHER, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-05-1731 |
| | § | |
| HALLIBURTON, *et al.*, | § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| REGINALD LANE, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-06-1971 |
| | § | |
| HALLIBURTON, *et al.*, | § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| KEVIN SMITH-IDOL, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-06-1168 |
| | § | |
| HALLIBURTON, *et al.*, | § | |
| *Defendants*. | § | |

MEMORANDUM OPINION & ORDER

Pending before the court are defendants' motions to dismiss under 12(b)(1) due to the presence of a political question (*Fisher* Dkt. 350, *Lane* Dkt. 176, *Smith-Idol* Dkt. 125) and motions for partial summary judgment based on the government contractor defense (*Fisher* Dkt. 352, *Lane* Dkt. 178, *Smith-Idol* Dkt. 127). Upon consideration of the motions, the responses, the replies, the summary judgment record, the applicable law, and for the following reasons, the motions to dismiss based on political question and the motions for partial summary judgment based on the government contractor defense are DENIED.

BACKGROUND

The facts of this case have been recited many times before, and for the purpose of this motion are better discussed in the analysis of the motions. Therefore, the court here gives only a short overview of the case. The plaintiffs were civilian contractors employed by defendants to drive fuel convoys in Iraq. The defendants provided services to the Army in Iraq under a blanket cost plus contract under the Logistics Civil Augmentation Program ("LOGCAP"). On April 8 and 9, 2004, the plaintiffs were sent out in fuel convoys. They came under serious attack by Iraqi insurgents, resulting in severe wounds, psychological trauma, and in some cases death. The surviving drivers, and the estates of the deceased and missing drivers, brought suit in state court against the defendants asserting, among other things, fraud, assault and battery, and negligence.

GOVERNMENT CONTRACTOR DEFENSE

Defendants move for partial summary judgment based on the government contractor defense. Early in the case, the defendants moved for dismissal based on the government contractor defense. Dkt. 32. The court denied their motion, finding that the defense historically applied only to "claims involving complex equipment acquired by the Government in its procurement process." *Fisher v. Halliburton*, 390 F. Supp. 2d 610, 616 (S.D. Tex. 2005). Upon the defendants' motion for reconsideration, the court clarified its order, allowing defendants to bring the defense again in a motion for summary judgment—assuming the evidence supported it. Dkt. 45. Now defendants move the court for partial summary judgment based on the government contractor defense.

**1. Summary Judgment Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV.

2

P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id.* "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-

movant.  *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

**2.      Government Contractor Defense**

Simply put, the government contractor defense allows federal law to displace state tort law in narrow, specific circumstances in suits against independent contractors.  *See Boyle v. United Tech. Corp.*, 487 U.S. 500, 108 S. Ct. 2510 (1988).  In those cases, if the government would be immune from suit, that immunity may sometimes be passed through to contractors performing the government's tasks.  *Id.*  Defendants argue initially that they are entitled to immunity because they meet the criteria set forth by the Supreme Court in *Boyle*.  Plaintiffs contend that, as indicated by the court in its earlier ruling on the motion to dismiss, the immunity available under *Boyle* applies only to procurement contracts.  And, since the LOGCAP contract is a service contract, *Boyle* does not apply to defendants.  Defendants counter that the Supreme Court's earliest government contractor defense case, *Yearsley v. W.A. Ross Construction Co.*, extended immunity to a contractor performing

4

a service contract with the government.  Therefore, they argue, the government contractor defense

is available to them.  Moreover, defendants also argue that the Fifth Circuit's recent holding in

*Ackerson v. Bean Dredging* addresses the availability of immunity for contractors in service

contracts, reaffirming the vitality of *Yearsley*.  The plaintiffs contend that *Ackerson* does not support

the defendants because it distinguishable.  The plaintiffs further argue that *Ackerson* supports their

argument that *Boyle* only applies to procurement contracts.  Because the court finds that the

defendants cannot meet the narrow circumstances required for immunity under either test, it need

not determine whether *Ackerson* limits *Boyle* as plaintiffs urge.

> **A.**     ***Yearsley v. W.A. Ross Construction Co.*** **and** ***Ackerson v. Bean Dredging***.

In *Yearsley*, the plaintiffs were land-owners who brought suit against a contractor for damage

to their properties located on the banks of the Missouri River.  *Yearsley v. W.A. Ross Const. Co.*, 309

U.S. 18, 19, 60 S. Ct. 413 (1940).  The work was done pursuant to an Act of Congress under the

direction of the Secretary of War for the purpose of improving navigation on the Missouri River.

*Id.*  The contractor, at the direction of the government, built a series of dikes in the river by

producing artificial erosion.  *Id.*  Unfortunately, part of the eroded lands belonged to the plaintiffs.

*Id.*  Plaintiffs sued the contractor.

The work was done pursuant to The Rivers and Harbors Improvement Act of 1927 which

specifically provided that under the supervision of the Chief of Engineers, work was authorized

"with a view to securing a permanent navigable channel six feet in depth and to conform to the

character and methods of improvement of said river."  44 Stat 1010, 1013.[1]  The Court began its

analysis with the assertion that "it is clear that if this authority to carry out the project was validly

---

[1] The current version of the Act is found generally in Chapter 12 of Title 33 of the United States Code.

conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Yearsley*, 309 U.S. at 414. It further explained that "[w]here an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred." *Id.* Therefore, in *Yearsley* since the contractor's actions were within the authority of his contract with the government, pursuant to a constitutionally enacted statute, the Court found that the contractor was not liable.

Very recently, the Fifth Circuit affirmed the vitality of *Yearsley* as it applies to service contracts in *Ackerson v. Bean Dredging, L.L.C.*, 589 F.3d 196 (5th Cir. 2009). The facts in *Ackerson* are startlingly similar to the facts in *Yearsley*. In *Ackerson*, the contractors were engaged in dredging projects in the Mississippi River Gulf Outlet ("MRGO") supervised by the Army Corps of Engineers; pursuant to an act of Congress creating and maintaining the MRGO. *Id.* at 207. Congress originally approved construction of the MRGO by the Army Corps of Engineers. *Id.* Thereafter, the Corps contracted yearly to have the MRGO dredged. *Id.* The plaintiffs in *Ackerson* brought suit against all the contractors who had performed dredging work for the Corps in the MRGO for damages the plaintiffs sustained as a result of Hurricane Katrina. They argued that "the MRGO project caused an amplification of the storm surge in the New Orleans region during Hurricane Katrina, undermining the levees and flood walls along the MRGO and the Industrial Canal that breached and flooded St. Bernard Parish and Orleans Parish." *Id.* They brought claims of negligence, breach of implied warranty, concealment, and violation of environmental-protection laws. *Id.* at 203. The district court dismissed the case against the contractors based on *Yearsley* and on that basis the Fifth Circuit affirmed. *Id.*

The Fifth Circuit distinguished the military-contractor product liability cases found in *Boyle*

and its progeny from the public-works contractor liability discussed in *Yearsley*. *Id.* at 205–06.

Expressly citing the vitality of *Yearsley*, the Court highlighted the similarity between the two cases,

stating that "[i]n both cases, the actions causing the alleged harm were taken pursuant to contracts

with the federal government that were for the purpose of furthering projects authorized by acts of

Congress." *Id.* at 206.  Then the Court turned to the type of allegations brought by the *Ackerson*

plaintiffs. *Id.* at 207.  The plaintiffs claimed that the MRGO project made the surrounding regions

more vulnerable to hurricane damage because of the project itself and the dredging activities that

went along with the project. *Id.*  The Fifth Circuit pointed to the fact that the plaintiffs did not

"allege that the Contractor Defendants exceeded their authority or in any way deviated from

Congress's direction or expectations" and found that *Yearsley* applied on the face of the plaintiffs'

complaint because their "allegations attack[ed] Congress's policy of creating and maintaining the

MRGO, not any separate act of negligence by the Contractor Defendants." *Id.*

In this case, none of the plaintiffs' claims is barred by the *Yearsley* defense.  The plaintiffs'

claims fall roughly into two categories: negligence, and intentional torts, including fraud.  As a

threshold matter, the plaintiffs' claims based on intentional torts and fraud are not barred by

*Yearsley*, because they exceed the authority of the LOGCAP contract.  It is axiomatic that one may

not contract to commit a tort. RESTATEMENT (SECOND) OF CONTRACTS § 192 (1981) ("A promise

to commit a tort or to induce the commission of a tort is unenforceable on grounds of public

policy."); 7 WILLISTON ON CONTRACTS § 16:14 (4th ed.) ("In general, a bargain which contemplates

a wrong to a third person, or to undefined members of the public, whether trespass, breach of trust,

or fraud, is illegal.").  Therefore, the plaintiffs' claims for fraudulent inducement, intentional

infliction of emotional distress, civil conspiracy, and intent to injure/assault exceed the authority of

7

the contract as a matter of law.  Certainly the LOGCAP contract contemplates that the defendants would need to hire employees to carry out the contract and that those employees would need to engage in activities in Iraq.  However, the contract did not—and could not—impose on defendants a duty to defraud those employees into entering their employment contracts, or that upon entering the contracts to commit other intentional torts against them.  The court undertakes no prognostication regarding the outcome of the plaintiffs' fraud and intentional tort claims.  But, they are not barred by the government contractor defense as laid out in *Yearsley*.

Plaintiffs' remaining claims—the negligence claims—also do not qualify for the *Yearsley* defense for two reasons.  First, the claims fall into an exception to *Yearsley* articulated by the Fifth Circuit in *Ackerson*.  The *Ackerson* court, in affirming the dismissal of the case based on the government contractor defense, stressed that the plaintiffs' "allegations attack[ed] Congress's policy of creating and maintaining the MRGO, not any separate act of negligence by the Contractor Defendants." *Ackerson*, 589 F.3d at 207.  Here, the plaintiffs do not claim that defendants are liable because of Congress's policy of allowing the armed forces to use civilian contractors during a war.  Instead, they claim that defendants, as the employer of the plaintiffs, had a duty of care to their employees that they violated when they sent the plaintiffs into an area the defendants knew to be actively under fire by insurgents.

Second, the claims do not qualify for *Yearsley* because they exceed the authority of the contract.  The defendants argue that they were under the plenary control of the Army, that the convoys went out according to strict protocols, and that they did not have the authority to refuse to send a convoy.  However, this argument finds support in neither the terms of the LOGCAP contract itself, nor the practice of the parties at the time.  The terms of the contract and its incorporated

8

documentation clearly contemplate situations so dangerous that KBR personnel could refuse to perform and, in fact, were not expected to perform.

The statement of work specifies quantities of fuel to be delivered to various areas at various times. Dkt. 353, Ex. 16, part 3 at DEF2679.2–.8.[2] However, at least one of the task orders specifies that the fuel is be delivered *safely*. Dkt. 353, Ex. 16, part 4 at DEF03320 (emphasis added). Additionally, the agreements between the Army and the defendants contemplated a well-defined command structure. Throughout the contract, the statement of work, and the task orders, the language is clear that the defendants had "exclusive supervisory authority and responsibility over employees." *See, e.g.,* Dkt. 353, Ex 16, part 1 at DEF02176. Although assignments for convoys may have come from the Army based on its needs, the final order to send a convoy came from the defendants' hierarchy down to its employee drivers. And, Craig Peterson, the defendants' supervisor over the fuel convoys, stated that it was his understanding that he had the authority to stop convoys and had, in fact, stopped convoys in the past. *See* Dkt. 353, Ex. 8 at 810, 812, 905.

Assuredly the contract, by its express terms, stated that the Army would provide force protection for the fuel convoys. And, the Army provided the intelligence on the safety of the routes, dictated the amount of fuel to be carried, the trucks in which it would be carried, the routes the trucks would take, and essentially every detail of the convoy itself. However, although the contract specified the amounts of fuel that were to be transported, it also specified when the KBR truck drivers would not be expected to deploy. Task order 43 states at paragraph 1.9 that

> The government will provide for the security of contractor personnel in convoys and on site, commensurate with the threat, and [in accordance with] the applicable Theater Anti-Terrorism Protection guidelines (paragraph 2.12).

---

[2] For ease, the court uses the docket numbers for the first-filed case, *Fisher, et al. v. Halliburton, et al.,* Civ. No. 05-1731.

Dkt. 353, Ex. 16, part 2 at DEF02661.   Paragraph 2.12 incorporates the document entitled

"Contractors on the Battlefield & Threat Assessment Matrix" into the task order and attaches it as

enclosure 4.   *Id.* at DEF02663.   The Matrix is compiled from the publication "Contractors on the

Battlefield."   *Id.* at DEF02679.10.   It lists and defines the various threat levels: negligible, low,

medium, high and critical.   *Id.*   The following is an edited excerpt from the Matrix.   *Id.*

| Threat Level | Definition | Indicators | Factors for Employing KBR |
|---|---|---|---|
| High | Demonstrated threat activity and intent are present. | - Peaceful enforcement<br>- Theater war operations where combat may occur<br>- Casualties likely | - Government Threat assessment<br>- Evaluate/Mitigate following threats:<br>• Direct Fire<br>• Indirect Fire<br>• Unexploded Ordinance<br>• [Nuclear, biological, and chemical attack/contamination<br>Provide local security<br>See Note [regarding mitigating factors][3] |
| Critical | Demonstrated threat activity and current threat information indicates preparation for a specific anti-US operation is present | Open warfare | |

*Id.*   Under a high threat, "only essential contractors remain in place."   *Id.*   For a critical threat level,

---

[3]   The note on mitigating factors under a high threat level reads:

Mitigating factors include but are not limited to armed military personnel in each contractor vehicle, communications equipment compatible with that of the military, a method of plainly identifying contractor vehicles, ability to refuel contractor vehicles, and a prohibition on movement at night.  A military point of contact must be identified who is responsible for assessing/assigning the current threat level.  Contractor personnel must be provided all necessary personal protective equipment to include primary and spare MOPP gear.

Dkt. 353, Ex. 16, part 2 at DEF02679.10, n. 3.

the Matrix dictates that "movement [is] restricted and within armed formations." *Id.* "Contractors

remain in the [area of operations] only if it is an absolute necessity or when contractor provided

support cannot be replaced with military capabilities." In a critical threat situation, the Matrix lists

no factors under which KBR should be employed. *Id.* In fact, that section of the Matrix is blacked

out indicating that KBR should not be employed when the threat level is critical. Even though the

threat level assessment is determined by the Army, not KBR, the contract clearly expects that KBR

employees would not be employed during a time of critical threat except in the most extreme cases.

Defendants argue that because the LOGCAP contract was a "rated" contract, they would be

criminally liable if they refused to perform. A rated order or contract is an order or contract

governed by a system of priorities implemented pursuant to Title I of the Defense Production Act

of 1950. 15 C.F.R. § 700.1. The LOGCAP contract carries a priority rating of DO. There are

essentially two ratings: DO and DX. 15 C.F.R. § 700.11. A rating of DX takes higher priority than

a rating of DO. *Id.* Both ratings take higher priority than unrated orders or contracts. *Id.* In addition

to the priority rating, the contract has a symbol defining what type of items are contained in the order

or contract, and the department under whose authority the rating has been assigned. *Id.* at Schedule

I to Part 700. The LOGCAP contract has a program identification symbol of C9 indicating that it

is a miscellaneous program[4] under the delegate authority of the Department of Defense. *Id.*

Additionally, the contract is specified as a requirements contract with an indefinite delivery date.

Dkt. 353, Ex. 16, part 2 at DEF02449. Rated orders must contain specific delivery dates, or in the

case of a requirements contracts specific "'calls', 'requisitions', and 'delivery orders'" . . .

"specify[ing] a required delivery date or dates." 15 C.F.R. § 700.12(b). These orders must be filled

---

[4] Other Department of Defense programs are for aircraft, missiles, ships, tanks, weapons and other identifiable goods. Notably, the only service programs are for construction and maintenance and repair—services related to the production and maintenance of goods. 15 C.F.R. § 700, Schedule I.

"in a timely manner to satisfy the delivery requirements of each rated order." § 700.14(a). Wilful

violations are a crime and can be punished by a $10,000 fine or a year in prison or both. § 700.74(a).

For several reasons, however, the court finds that the DO rating on the LOGCAP contract

did not remove KBR's ability to stop convoys when it judged the conditions were critical. Most

importantly, the Defense Production Act of 1950 did not contemplate this type of contract when it

was enacted. The Defense Production Act of 1950 answered the President's call for military strength

and preparedness in the face of North Korea's "lawless" aggression. H. R. REP NO. 81-2759 (1950),

*as reprinted in* 1950 U.S. Code Cong. Serv., pp.3620–21. The House Report describes Title I of the

Act as giving the President the authority "to assign priorities and to allocate materials and facilities"

thereby "channeling needed materials into production for the national defense." *Id.* at 3623. The

report goes on to discuss concerns of price gouging and the consumer retail market's interference

with orders for materials for the national defense. *Id.* The Act addresses goods and the services

necessary to produce those goods, not pure services. In fact, the original version of the Act expressly

excepts pure services from its purview, stating that Title I "authorizes the President to require that

performance under contracts or orders *(other than contracts of employment)* which he deems

necessary or appropriate to promote the national defense shall take priority over performance under

any other contract or order." *Id.* at 3635 (emphasis added). Legislative history for the subsequent

amendments of the Act also illustrates that the Act is geared towards industry readiness in case quick

mobilization is needed in time of war. S. REP. NO. 96-166 (1979), *as reprinted in* 1980

U.S.C.C.A.N. 1743, 1744. Nor does the plain language of the modern version of the Act support

the application of the rated contract system in the manner the defendants suggest. The current

version's policy statement still focuses on the diversion of materials and facilities from civilian use

in support of our mobilization effort. 50 U.S.C. app. § 2062. And the priorities section still excludes

employment. § 2071(a) ("The President is authorized . . . to require that performance under contracts

or orders *(other than employment)* which he deems necessary . . .") (emphasis added).  Therefore,

an interpretation of the rating on the contract that requires the exact timing of the dispatch of the

convoys or face criminal penalties is not supported by the plain language of the Defense Production

Act nor its legislative history.  Additionally the court notes that even if it found that the exact timing

of the movement of the convoys was enforceable by criminal sanctions—which it does not—the

record does not indicate that the government supplied the necessary specific "'calls', 'requisitions',

and 'delivery orders'" . . . "specify[ing] a required delivery date or dates" as required under the

regulations. 15 C.F.R. § 700.12(b).  Therefore the absence of an essential element of a rated contract

or order—a delivery date—would alleviate the obligation on the part of the defendants.

Lastly, the LOGCAP contract itself contemplates less than perfect performance.  The contract

is a Cost Plus Award Fee contract.  Dkt. 353, Ex. 16, part 2 at DEF02223.  A special board, created

for the purpose, periodically calculates an award or bonus based on a rating of average or below,

good, very good, or excellent.  *Id.* at DEF02227.  The board determines the ratings through a

numerical system and its own subjective review.  *Id.* at DEF02224–25.  Contractors are evaluated

in three main categories: technical, cost, and management. *Id.* at DEF02228.  The technical category

is further broken down into three subcategories, one of which is adherence to schedule.  *Id.*  In this

subcategory a contractor can earn a "good" rating with "[s]ome minor but no critical contractor

controlled schedule delays."  *Id.*  And arguably, insurgent attacks are not "contractor controlled,"

thus allowing a contractor to earn a rating of "very good" or "excellent."  *Id.*  The contract

contemplates that any rating of "good" or higher receives an award fee.  *Id.*  at DEF02227.  The

contract does not suggest criminal sanctions or breach if the defendants experience contractor

controlled schedule delays.  On the contrary, even with some delays, the defendants could still earn

13

a rating of at least "good" and receive a bonus. Thus, the court finds that the LOGCAP contract does not support the defendants' interpretation that they could not refuse to dispatch a fuel convoy for safety reasons, because the LOGCAP contract (1) gave sole authority over contractor employees to the defendants, (2) excepted critical threat situations for use of civilian contractors, and (3) anticipated less than perfect performance as illustrated by the bonus award rating system. Moreover, the defendants' rated contract argument finds no support in either the plain language of the Defense Production Act or its legislative history. Therefore, the plaintiffs' negligence claims do not qualify for the government contractor defense because they fall within an exception articulated by the Fifth Circuit in *Ackerson*, and the actions on which they are premised exceed the authority of the contract. Accordingly, for the forgoing reasons, the court finds none of the plaintiffs' claims is barred by the *Yearsley* defense.

> B.     ***Boyle v. United Technologies Corp.* and its Progeny**

Alternatively, the defendants argue that they are entitled to the government contractor defense because they meet the factors laid out by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S. Ct. 2510 (1988). The plaintiffs remind the court that it has held the government contractor defense under *Boyle* applies only to procurement contracts. Moreover, the Fifth Circuit in *Ackerson*—as discussed above—has recently emphasized the distinction between service and procurement contracts for the purposes of the *Boyle* defense. Therefore, the plaintiffs argue that the *Boyle* defense is not available to the defendants under either the law of the case or *Ackerson*. The court agrees that *Ackerson* appears to foreclose the *Boyle* analysis for service contracts. However, in this case all roads lead to Rome, because even if the court were to apply *Boyle*, the defendants do not meet the required criteria for the *Boyle* defense.

In *Boyle*, a United States Marine copilot was killed when he was trapped inside a submerged helicopter with design flaws in the escape hatch system; an outward opening hatch under water cannot function due to water pressure. *Boyle*, 487 U.S. at 502. In examining the source and parameters of the government contractor defense, the Court began its inquiry by determining whether the procurement of equipment by the United States was an area of uniquely federal interest. *Id.* at 504–08. The Court stated that the federal interests underlying the "obligations to and rights of United States under its contracts," and "the civil liability of federal officers for actions taken in the course of their duty" were closely related to "the civil liabilities arising out of the performance of federal procurement contracts." *Id.* at 504–06. Citing *Yearsley*, the Court wrote that "[t]he federal interest justifying [the holding in *Yearsley*] surely exists as much in procurement contracts as in performance contracts; we see no basis for distinction." *Id.* at 506. The Court concluded that because the imposition of liability on government contractors would directly affect the availability and terms of contracts with the government, procurement contracts were a uniquely federal interest. *Id.* at 507.

Having thus concluded, the Court explained that the existence of a uniquely federal interest was merely the first step in the inquiry. *Id.* "Displacement will occur only where . . . a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation." *Id.* (citing *Wallis v. Pan Am. Pet. Corp.*, 384 U.S. 63, 68, 86 S. Ct. 1301 (1966); *United States v. Kimball Foods*, 440 U.S. 715, 728, 99 S. Ct. 1448 (1979)). The Court explained that while the conflict need not be as sharp as that required for regular preemption, the basis of the contractor's liability must be contrary to a duty assumed under the contract. However, the Court clearly envisioned that situations would arise where the duties did not conflict and gave the following example.

15

> If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

*Id.* at 509.

Additionally, the Court looked to the Federal Torts Claims Act because it "demonstarate[d] the potential for, and suggest[ed] the outlines of, 'significant conflict' between federal interests and state law in the context of Government procurement." *Id.* at 511. Specifically, the Court used the contours of the exception from consent to suit for discretionary functions. That exception applies to

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). In *Boyle*, the government specified the precise design of the helicopter, including the latch. *Boyle*, 487 U.S. at 511. Therefore, the Court concluded that the government had exercised discretion in balancing the many factors that went into the design of the helicopter—"including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* The Court explained that had the government simply ordered stock helicopters, no discretion would have been exercised, and the contractor could have been sued under state tort law.

The facts of this case are ill-suited for analysis under *Boyle*. However, assuming for the sake of argument, that *Boyle* is the proper test, the first prong is met—contracts with the government are a uniquely federal interest. Therefore, the court moves to the second prong—whether the basis of

16

the defendants' liability is contrary to a duty assumed under the LOGCAP contract, the statement of work, and related task orders. As discussed above, the liability alleged in the plaintiffs' intentional tort and fraud claims are completely separate from any duty assumed under the LOGCAP contract as a matter of law. Therefore, the court sees no conflict necessitating displacement of those claims under *Boyle*.

The plaintiffs' claims based on negligence also do not conflict with a duty under the contract. The defendants' duty under the LOGCAP contract as it pertains to fuel convoys was to deliver safely certain amounts of fuel within certain increments of time. The Army dictated how convoys should travel, but the contract expressly places the ultimate duty of directing the civilian employees upon the defendants, not the Army. Arguably, the LOGCAP contract's emphasis on this command structure reinforces, rather than conflicts with, the defendants' duty to its employees.

Moreover, as discussed above, the contract neither contemplated, nor required, that civilian contractors be sent into areas know to have a critical threat level. Even if the threat level were not critical, under the terms of the LOGCAP contract, defendants had the choice to miss some "contractor controlled" deadlines and earn a smaller bonus without being in breach. Put another way, the LOGCAP contract imposed no duty upon defendants to send their employees into an area known to be under fire. Based on the terms of the contract, the court finds that the defendants' "could comply with both [their] contractual obligations and the state-prescribed duty of care" to the plaintiffs without conflict and, thus, the plaintiffs' negligence claims are not barred by the government contractor defense under the *Boyle* formulation. Accordingly, the court finds that the government contractor defense under both *Yearsley* and *Boyle* does not apply to any of the plaintiffs' remaining claims, and the defendants' motions for partial summary judgment are DENIED.

### POLITICAL QUESTION

The defendants reurge their motions to dismiss based on the presence of a political question. On September 22, 2006, this court dismissed this case based on the presence of a non-justiciable political question, finding that the case met three of the *Baker* formulations.[5]  *Fisher v. Halliburton*, 454 F. Supp. 2d 637, 644 (S.D. Tex. 2006).  On May 28, 2008, the Fifth Circuit disagreed, reversing and remanding the case.  *Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008).  The Fifth Circuit found that it was at least plausible that this court could try these state law claims "without needing to make a constitutionally impermissible review of wartime decision-making."  *Id.* at 568.  The appellate court, while  recognizing that certain claims move precariously close to the political question doctrine, held that in order for the political question doctrine to bar a claim "a court must satisfy itself that political question will certainly and inextricably present itself."  *Id.* at 565, 567.  It remanded the case to this court for further discovery, stating that under a more fully developed record, the court might again find the presence of a political question.

---

[5]  The Supreme Court has set out a list of six formulations to aid courts in a "discriminating inquiry into the precise facts and posture of the particular case."  *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691 (1962).

> (1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> (2) or a lack of judicially discoverable and manageable standards for resolving it;
>
> (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
>
> (5) or an unusual need for unquestioning adherence to a political decision already made;
>
> (6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.*

On remand, this court has allowed significant discovery. Based on a greatly expanded record, the court now reviews the evidence and the plaintiffs' claims in light of the Fifth Circuit's guidance. The court finds that this expanded record has not sent "this case towards the political question barrier." *Id.* at 568. If anything, the record makes it clear that although the political question doctrine lurks just around the corner, it can be extricated from the plaintiffs' claims against the defendants. And, the court finds nothing in the expanded record to demonstrate that the facts underlying the three *Baker* formulations examined by the Fifth Circuit have changed so as to bring the doctrine back to the forefront.

The first *Baker* formulation examined by the appellate court was a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691 (1962). The Fifth Circuit held that in order for KBR to qualify under this formulations, it had to demonstrate that "that the claims against it will require reexamination of a decision *by the military*" and "that the military decision at issue is . . . insulated from judicial review." *Id.* at 560 (emphasis in original). For many of the same reasons articulated in the reasoning above concerning the government contractor defense, the court finds that the defendants have not demonstrated that the final decisions to send the plaintiffs' convoys on those days, and at those precise times were military decisions. Therefore, the first formulation does not implicate separation of powers concerns.

The arguments regarding the second *Baker* formulation—the lack of judicially manageable standards—are similarly unaided by the expanded record. The Fifth Circuit held that although the case might "require a review of the information KBR received from the Army, understanding also when it was received," "[t]he question would be what KBR did after receiving the information not how ably the military gathered or interpreted it." *Lane*, 529 F. 3d at 567. And, that question could

be resolved using ordinary tort standards with a possible adjustment "to account for the 'less than hospitable environment' in which KBR operated." *Id.* at 563. In the expanded record before the court, there is no indication that the political question doctrine has moved any closer to the forefront. The claims are still state law tort claims, governed by state tort laws. Therefore, the second formulation does not necessitate dismissal based on political question.

The third *Baker* formulation at issue here—a nonjudicial policy determination—is completely unchanged since the Fifth Circuit's examination of it. Under that formulation, the appellate court held that the broad-based policy decision regarding whether contractors should be used in combat-support roles could have placed the case beyond the competence of the judicial branch. *Id.* However, it explained that here "[t]he court will be asked to judge KBR's policies and actions, not those of the military or Executive Branch." *Id.* The focus of the inquiry has not changed since the Fifth Circuit examined it. Accordingly, the third formulation does not implicate the political question doctrine. Thus, the court finds that the expanded discovery in this case does not change its position on the political question doctrine from that taken by the Fifth Circuit in *Lane v. Halliburton.* Therefore, the motion to dismiss based on the presence of a nonjusticiable political question is DENIED.

It is so ORDERED.

Signed at Houston, Texas on February 8, 2010.

_____
Gray H. Miller
United States District Judge